# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs January 15, 2002

## STATE OF TENNESSEE v. VICTOR EUGENE TYSON

**Direct Appeal from the Criminal Court for Davidson County**
**No. 97-A-64      Seth Norman, Judge**

---

**No. M1999-00631-CCA-R3-CD  - Filed January 21, 2003**

---

The Davidson County Grand Jury indicted the Defendant for first degree premeditated murder, felony murder, attempted first degree murder and five counts of reckless endangerment. A Davidson County jury found the Defendant guilty of second degree murder, felony murder, attempted first degree murder and five counts of reckless endangerment. After merging the Defendant's convictions for second degree murder and felony murder, the trial court sentenced the Defendant to life imprisonment. The trial court sentenced the Defendant to thirty-five years for the attempted first degree murder conviction to be served consecutively to the life sentence. The trial court merged the five reckless endangerment convictions and sentenced the Defendant to three years to be served concurrently with the other sentences. The Defendant now appeals, arguing the following: (1) that the trial court erred by failing to instruct the jury on all lesser-included offenses; (2) that the trial court erred by denying the Defendant's motion to suppress a photographic lineup; (3) that insufficient evidence was presented at trial to support the Defendant's convictions; (4) that trial counsel was ineffective; and (5) that the trial court improperly assumed that as a matter of law, the sentences in this case must be served consecutively to a prior federal sentence. Concluding that the trial court committed reversible error (the State concedes), by failing to instruct the jury on certain lesser-included offenses of premeditated murder, felony murder and attempted first degree murder, we reverse those three convictions and remand Counts 1, 2, and 3 to the trial court for a new trial. We affirm the conviction for reckless endangerment in Count 4 and the three year sentence imposed in that count. We also remand Count 4 for the trial court to determine whether the sentence imposed in Count 4 should be served concurrently with or consecutively to the Defendant's federal sentence.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Reversed in Part, Affirmed in Part and Remanded**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which DAVID H. WELLES and THOMAS T. WOODALL, JJ., joined.

Paul J. Bruno (on appeal); and Thomas T. Overton, Nashville, Tennessee (at trial), for the appellant, Victor Eugene Tyson.

Paul G. Summers, Attorney General and Reporter; Patricia C. Kussmann, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; Pamela S. Anderson and Lisa Naylor, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

On August 3, 1996, the Defendant participated in a "drive-by" shooting in Nashville. While attempting to shoot Jay King, with whom he had been involved in an altercation just prior to the "drive-by," the Defendant shot and killed Derrick King. Numerous shots were fired by the Defendant, endangering Ernest Christian, Corey King, Ernest King, Ronald Scruggs, and Alonzo Stevenson, all of whom were present at the scene.

In an eight-count indictment, the Davidson County Grand Jury indicted the Defendant for the following crimes: (1) premeditated murder of Derrick King; (2) felony murder of Derrick King during the attempted perpetration of the premeditated murder of Jay King; (3) attempted premeditated murder of Jay King; (4) reckless endangerment of Ernest Christian; (5) reckless endangerment of Corey King; (6) reckless endangerment of Ernest King; (7) reckless endangerment of Ronald Scruggs; and (8) reckless endangerment of Alonzo Stevenson. A Davidson County jury found the Defendant guilty of the lesser-included offense of second degree murder of Derrick King; felony murder of Derrick King; attempted premeditated murder of Jay King; and all five counts of reckless endangerment. The trial court merged the Defendant's convictions for second degree murder and felony murder and sentenced the Defendant to life imprisonment. The trial court sentenced the Defendant to thirty-five years for the attempted first degree murder conviction, to be served consecutively to the felony murder sentence. Finally, the trial court merged the five reckless endangerment convictions, sentenced the Defendant to three years incarceration for the merged convictions, and ordered that the sentence run concurrently with the other sentences.

I. FACTS

Philander Jones testified that in August 1996, he had known the Defendant for "about a year." Jones recalled that on August 2, 1998, he and Shawn McQuiddy were "[a]t the house on 16th [Avenue North]" eating and watching television. He stated that he knew McQuiddy because he "sold dope for him." According to Jones, the Defendant arrived at the house and stated that he and Jay King "had got into it at Amoco." Jones recalled that the Defendant then showed him a bullet hole in the sole of his white Reebok shoes. Jones testified that he had heard of Jay King, but he had never met him.

Jones testified that Shawn McQuiddy called his brother, Darrell McQuiddy, and within ten or fifteen minutes, Darrell McQuiddy "and another car" carrying three men arrived at the house. Jones stated that when Darrell McQuiddy arrived, Shawn McQuiddy told Jones to go inside the house and turn off the lights. Jones testified, "When I came back out . . . we saw a black Yukon go down the alley. And, by that time, we all paired up and got in cars." Jones reported that he was in a red Corvette that Shawn McQuiddy was driving, Darrell McQuiddy and the Defendant were in a

black Cadillac which Darrell McQuiddy was driving, and the other three men were in a brown car. Jones stated that one of the three men in the brown car was carrying "an oozie or AK" weapon strapped onto his shoulder. Jones testified that Shawn McQuiddy had a gun in the car, and he stated that Darrell McQuiddy also had a gun. Jones claimed that he did not see the Defendant with a gun that night.

Jones testified that he and Shawn McQuiddy drove "towards Buchanan" while the other two cars drove down 16th Avenue. Jones recalled that at some point, Shawn McQuiddy spoke to someone on the telephone, and then he and Jones met Darrell McQuiddy near the corner of Tennessee State University (TSU). Jones stated that the two cars then "went around towards Preston-Taylor . . . to . . . a stop sign." Jones reported that "it was the brown car, Darrell's [McQuiddy's] car, then [the car he and Shawn McQuiddy were in]." Jones testified, "[T]hey pulled off, turned off the lights and drove fast and started shooting." Jones stated that Shawn McQuiddy then drove back by TSU and dropped Jones off at his house. Jones maintained that the car in which he was riding did not pass 2909 Clifton Avenue; however, he stated that the other two cars did drive by that address. Jones testified that as the other two cars drove past the Clifton Avenue residence, "the lights go off and just, you see flares coming from the [car] window." Jones explained that the flares were "from the gunshots." Jones stated that after he saw and heard the gunshots, Shawn McQuiddy drove him home.

On cross-examination, Jones testified that on a prior occasion, he had seen a Yukon at a carwash, and Shawn McQuiddy had told him that it belonged to Jay King. Jones stated that he guessed that it was Jay King's Yukon that he saw driving down the alley just before the shootings. Jones maintained that he was not involved in killing Derrick King, one of the victims in this case. Jones testified that he did not know that anyone had been shot until he heard that the Defendant had been arrested. However, Jones admitted that even after the Defendant's arrest, he did not inform police about his knowledge of the case.

Darrell McQuiddy testified that at the time of trial, he was twenty-seven years old and that he was incarcerated. McQuiddy acknowledged that he was charged with the murder of victim Derrick King, the solicitation to murder Jay King, the attempted murder of Jay King, and reckless endangerment. He testified that he had known the Defendant since 1989. According to McQuiddy, on August 2, 1996, the Defendant called McQuiddy's cell phone, stated that he and King "got into it," and asked to "meet him on 16th." McQuiddy explained that the triplex on 16th Avenue North was a "crack house." McQuiddy testified that he was at home on Brick Church Pike when he received the call and that he then went to the residence on 16th Avenue in a black, 1995 El Dorado.

Darrell McQuiddy testified that when he arrived at the house on 16th Avenue, he saw his brother, Eric Brown, a man named Kendall, a man named John, a man called "J.J.," Diandre Jones and Philander Jones all standing in front of the triplex. Darrell McQuiddy recalled that when he arrived at the triplex, he asked the Defendant what had happened. According to McQuiddy, the Defendant stated that while he was at an Amoco station, Jay King had been arguing with someone,

and then King "pulled off and said something to [the Defendant] and shot at [the Defendant], so [the Defendant] shot back at [King]."

Darrell McQuiddy testified that when he went to the triplex, he was carrying a "45 Caliber" weapon. He also testified that the Defendant, John, Kendall and J.J. all had weapons. Darrell McQuiddy stated that the Defendant had a semiautomatic weapon. McQuiddy reported that he asked the Defendant where his car was located, and the Defendant replied that he had run down to 16th Avenue from the Amoco station. He stated that after the Defendant told him that he knew where to find King, Darrell McQuiddy said "Let's ride." He explained that he planned to "take care of [King]," meaning that he planned to kill him. McQuiddy testified that he drove his car with the Defendant in the passenger seat; that Shawn McQuiddy and Philander Jones got in a red convertible corvette; and that Kendall, John, and J.J. got in a third car.

Darrell McQuiddy testified that the three cars then drove towards west Nashville to a street which he believed was called "Clifton." He stated that he told his brother to "turn off" because he did not want King to see the Corvette and get "spooked." McQuiddy explained that King might be "spooked" by the Corvette because King knew that Shawn McQuiddy and the Defendant were good friends. While driving towards west Nashville, Darrell McQuiddy called his brother and told him to meet the three cars at a three-way stop on 33rd Avenue. McQuiddy testified that after the three cars met at the stop sign, they all drove to Georgia Court. Darrell McQuiddy stated that on the way, the Defendant saw Jay King's truck. McQuiddy recalled that "[a] lot of people" were standing in the front yard at the residence where the truck was parked. Darrell McQuiddy told the other men that he saw the truck, and all three cars turned around. He reported that he told his brother to "turn off" again so that King would not see him.

Darrell McQuiddy explained that the beige car carrying J.J., Kendall and John came to a complete stop in front of the house. McQuiddy testified that he also stopped in front of the people standing in the yard. He stated that the passenger side of his vehicle was closest to the yard. According to McQuiddy, the Defendant "hung out the window and shot" at the people in the yard. McQuiddy testified that the men in the beige car also shot at the people in the yard. He reported that he remained in front of the house on Clifton Avenue "until the gun was empty," but he maintained that he did not shoot anyone.

Darrell McQuiddy testified that after the shooting, he drove to 1509 10th Avenue North, a former "crack house." McQuiddy maintained that he did not have any problems with King and stated that he went to the house on Clifton Avenue only because the Defendant wanted to go. He acknowledged that if he had not been indicted in this case, he would not have told police about the Defendant's involvement. Darrell McQuiddy denied that he was charged with attempting to hire John Gooch to kill Jay King. However, he admitted to pleading guilty in federal court to conspiracy to distribute cocaine, possession of a firearm during drug trafficking, conspiracy to launder money, and three counts of engaging in a financial transaction to conceal proceeds of an illegal activity.

Jay King testified that Derrick King was his cousin and that he saw Derrick King "[j]ust about every day." King testified that on August 2, 1996, he and Kennedy Marshall had been at King's mother's house. He stated that when they left his mother's house, he and Marshall stopped to get gas. King stated that he was in truck similar to a Yukon. King described the vehicle as black with turquoise on the bottom. King recalled that as he was pumping gas, a man named Esau approached him and began arguing with him "about an incident where [Esau] said [King] was supposed to have been coming into a crack house or something and robbing the place." King stated that Esau accused him of planning to steal from a crack house. He testified that after he and Esau "got that straight," the Defendant drove up in a Cadillac and was "flexing." King reported that as the Defendant pulled up, King asked him "what he was looking at," and then the two men "exchanged words and got to arguing."

King testified that he was in his truck leaving the gas station when he heard the Defendant, who was standing outside pumping gas, call him "Another B." King explained that "Another B." means bitch. King stated that he asked the Defendant what he had said and "made a move like [he] was fixing to turn around." King testified that as he was about to turn, "five shots rung out at [him]." King stated that "[o]ne bullet rang out close to [his] head and that's when [he] went down . . . thought [he] had been shot." King testified that after he heard the shots, he pulled across the street to a store parking lot. King reported that he put the truck into four-wheel drive, and Marshall "went out the window with the gun." King testified that he and Marshall then tried "to go back and get [the Defendant]."

King testified that he left the parking lot and drove "back across the street into the gunfire . . . trying to get the one who was shooting at [him]." King acknowledged that he went back towards the gas station "with the intent for [the Defendant] to get shot." King stated that as he was driving back towards the gas station, "they" were still shooting at him. King testified that at one point Marshall jumped out of the truck, but air started leaking out of one of the truck tires which had been shot so Marshall jumped back into the truck. King stated that once Marshall was back inside the truck, King drove on "back streets" to 18th Avenue and Jefferson Avenue. King testified that he parked the car on the sidewalk, and he and Marshall walked to 2909 Clifton Avenue, where Derrick King lived. King reported that Ernest King, "Kenny," (presumably referring to Kennedy Marshall), Alonzo Stevenson, and Derrick King all helped him fix the tire. King testified that they then drove the vehicle back to 2909 Clifton Avenue and parked it behind the house.

King testified that after he got to the house on Clifton Avenue, he left in a gray Cadillac to get some beer and food at a nearby store, and while driving to the store, he noticed a car riding around. King stated after leaving the store, he returned to the house on Clifton Avenue and waited for Kennedy Marshall to return. He stated that he called his younger brother, Corey King, and asked him to go meet Marshall. According to King, Marshall gave Corey King "a whole bag of guns." King testified that while he was sitting on the porch, he looked to his left and saw a car with "no lights on." King stated that as the car turned onto Clifton Avenue, the lights "jumped on all of a sudden," and shots rang out. King testified that "bullets started going everywhere." King recalled

that when the shots began, he was still on the porch and that the Derrick King, Stevenson, Corey King, and Ernest King were all outside.

King testified that when the shooting began, he jumped over the porch railing and ducked behind the gray Cadillac for cover. King stated that once he was behind the car, he saw the Defendant trying to shoot at him; however, Derrick King was "more . . . in the way." King stated that he tried to pull his cousin behind him as the bullets were "bouncing up everywhere." According to King, the Defendant "extended his body out of the window trying to get a shot at [King]." King explained that the Defendant was in the passenger's seat of one of the cars. King testified that during the shooting he saw both a gray Chevrolet with a yellow hood and a yellow Camaro driving by. King reported that Ernest King, Corey King, and Alonzo Stevenson were all in the yard during the shooting. King also reported that his uncle, Ernest Christian, and Ronald Scruggs were asleep inside the house.

King stated that as the two vehicles approached the house, the gray Chevrolet stopped, fired some shots, and pulled away. King recalled that within seconds, another car pulled up, and shots were fired from the second car. King testified that after the two cars drove away, he noticed that the victim was bleeding from the head. King stated that he called the police, and Ernest King tried to perform CPR. King reported that Corey King left before the police arrived. King testified that after the police arrived and found a "[s]treet sweeper," a sawed off shotgun and a hand pistol in the car, he went with the police to the Amoco station. King identified a long-barreled gun in court as belonging to him, and he stated that the other guns belonged to Kennedy Marshall. King maintained that he saw the Defendant in one of the cars, and he maintained that the Defendant was shooting at him.

On cross-examination, King testified that he did not have any problems with the Defendant before the incident in this case. He stated that the Defendant "must have been mad about something else" because "just arguing" would not normally lead to gunfire. According to King, the original argument with Esau "just ended," and King could not explain why. King acknowledged that it was "wrong for [him] to be in the car with the shooter . . . knowing what he was trying to do to them." However, King maintained that he did not fire any of the shots himself. King testified that the Defendant was in a gold Cadillac at the gas station. King stated that the Defendant was using a "blue steel" gun.

King admitted that he previously told Detective Bernard that none of the guns found in the car belonged to him. King stated that on the night of the incident he had been drinking, but he maintained that he was not drunk. King testified that when he left the scene of the first shooting to fix the flat tire, they "left Marshall back around the way" because Marshall had to "get the guns and stuff." King stated that Marshall was shooting a "40 block" and a "45 handgun." King testified that he recognized only the Defendant as one of the people shooting at him.

Ernest King testified that Derrick King was his nephew and that Jay King is his cousin. Ernest King stated that he lived in the house at 2909 Clifton Avenue, and he reported that he was

-6-

home on the evening of August 2, 1996. He recalled that Jay King, Corey King, Alonzo Stevenson, Ernest Christian (Junior's father), and Ronald Scruggs were also present. Ernest King testified that Christian and Scruggs were inside the house during the incident in this case. He stated that everyone else was outside in the yard when "cars came by and started shooting." Ernest King testified that once the shooting started, he "got down on the ground" and got only a "vague look" at the cars from which the shots were fired. He further testified that he was unable to see any of the people inside the cars. After the shooting ceased, Ernest King noticed that his nephew had been injured and was unconscious. He stated that he went inside the house, called an ambulance, came back outside, and along with Alonzo Stevenson, tried to perform CPR on the victim. Ernest King recalled that when he spoke to the police, he described the first car as a vehicle which appeared to look "like an Impala" with a "greenish" hood. He described the second car as a vehicle which appeared to be a canary yellow Malibu. He stated that on the night of the offense, there was a street light across the road from his driveway.

On cross-examination, Ernest King stated that the hood of the car that he referred to as "greenish" was actually a light, "almost like a yellow-like hood." He acknowledged that he signed a consent for the police to search his vehicle, and he stated that the police found "some shells, [a] 12 gauge and a 38" in the car. However, he stated that he did not know how the guns got in his car.

Corey King testified that he is Jay King's brother and Ernest King's cousin. He stated that Derrick King was also his cousin. Corey King testified that he was at 2909 Clifton Avenue on the night of the offense. He recalled that when he heard gunfire, he "dropped to the ground and . . . jumped back up and looked and then . . . returned fire." Corey King testified that he was only able to see the back of a yellow car. He stated that he was unable to see anyone who was shooting.

Officer Freddie Garrette testified that he responded to a dispatch for a shooting at 2909 Clifton Avenue around 1:30 a.m. on August 3, 1996. Garrette stated that he was the first police officer on the scene, and he observed an individual lying on the front porch and two other individuals administering CPR. According to Garrette, the victim had a gunshot wound to the top of the head. Garrette testified that during his investigation of the scene, he went to the house next door, 2911 Clifton Avenue, and observed that one of the windows was "shot out." Garrette stated that he recovered shell casings "that were strung all out in the street."

Sergeant Duane Phillips testified that in the morning hours of August 3, 1996, he went to the crime scene at 2909 Clifton Avenue. Sgt. Phillips stated that there were shell casings in the street up to fifty or sixty yards from the crime scene. He testified that he secured the crime scene and interviewed witnesses. Sgt. Phillips observed a black Blazer and a gray Buick behind the residence. He testified that the Buick had been driven just prior to his arrival because he could smell the brakes burning. Sgt. Phillips observed weapons on the seat of one of the vehicles. Inside the glove box of the Cadillac behind 2909 Clifton Avenue, he found a "38 revolver."

Sgt. Phillips also went to an Amoco gas station on D.B. Todd Boulevard during his investigation. At the Amoco station, he observed what appeared to be bullet holes in the gas tank

and shell casings in the street and parking lot. Sgt. Phillips stated that he investigated the gas station because he had been told that there had been a shooting there.

Thomas E. Simpkins testified that he worked in the Identification Section of the Nashville Metropolitan Police Department. Simpkins stated that he processed the crime scene at 2909 Clifton Avenue on August 3, 1996. Simpkins reported that casings found at that residence were fired from a nine-millimeter weapon. Simpkins testified that he observed bullet "strike marks" on the residence located at 2911 Clifton Avenue and a strike mark through the front door of that house. In addition, he observed a bullet strike on the fence between the two houses. Simpkins testified that he also processed the scene at the Amoco station where he observed that the gas pump had been shot. According to Simpkins, some projectiles and some spent forty-caliber and ten-millimeter shell casings were found in the area. Simpkins reported that he went to the market across the street from the Amoco station and collected seven spent forty-caliber shell casings and a lug nut.

E. J. Bernard testified that he worked in the Homicide Division of the Nashville Metropolitan Police Department. Bernard stated that he responded to the crime scene at 2909 Clifton Avenue on August 3, 1996. Bernard observed shell casings, and he noticed that the front door window of the house next door had been shot out. He also observed bullet holes inside the residence. Bernard testified that evidence found at the scene indicated that someone had been injured. After being advised that there had been a shooting earlier in the evening at the Amoco station, Bernard went to the station to investigate. Bernard testified that there was damage to at least one of the gas pumps and that there were casings on the property of the Amoco station, as well as at least one shell casing in the parking lot of the market across the street from the Amoco station.

Bernard testified that at the scene, "some of the witnesses told [him] that the person that shot the victim during the drive-by shooting was a man named Victor Tyson," so Bernard showed them a picture lineup to be certain of the person to whom they were referring. According to Bernard, Jay King was the only person who made a positive identification of the Defendant as the shooter. Bernard testified that the murder weapon was not recovered. Bernard reported that nine-millimeter shell casings were found at the scene.

On cross-examination, Bernard stated that he was the chief homicide detective in charge of investigating the shooting on Clifton Avenue. He testified that at some point, Jay King told him that the Defendant had attempted to shoot him at the Amoco station. According to Bernard, King also stated that Kennedy Marshall was involved in the shooting; however, Bernard stated that he was unable to locate Marshall for questioning. Bernard testified that King also told him about a confrontation he had with a man named Esau at the Amoco station. Bernard did not try to locate Esau.

Bernard testified that he was told that only one vehicle was involved in the shooting on Clifton Avenue. He did not recall anyone telling him about a black Cadillac. Bernard testified that nine-millimeter shell casings were found at the scene. He reported that when the Defendant was arrested, he had a thirty-eight-caliber weapon in his car. Bernard stated that ten-millimeter and forty-

caliber casings were found at the Amoco station. According to Bernard, the Defendant denied firing shots at either location, and the Defendant blamed Kennedy Marshall for the shooting at the Amoco station. Bernard testified that two shotguns and two handguns were found at the Clifton Avenue scene. He testified that witnesses told him that more than one person was involved in the drive-by shooting.

Dr. Bruce Levy testified that in July 1997, he became the Chief Medical Examiner for the State of Tennessee. Dr. Levy testified that Dr. Miles Jones performed the autopsy on Derrick King. Dr. Levy stated that he reviewed Dr. Jones' records of the autopsy performed on the victim. He testified that a bullet entered the upper right portion of King's head, traveled through the skull, and struck the brain. Dr. Levy stated that the bullet was recovered from the cerebellum, located in the lower back portion of the head. He reported that King died in the hospital shortly after suffering the injuries. According to Dr. Levy, Dr. Jones noted that the gun was fired from a distance of three feet or more from the victim.

## II. ANALYSIS

### A. Lesser-Included Offenses

The Defendant argues that the trial court erred by failing to instruct the jury on all lesser-included offenses. The Defendant was charged in Count 1 of the indictment with the first degree premeditated murder of Derrick King, and the trial court instructed the jury as to first degree premeditated murder and second degree murder. In Count 2 of the indictment, the Defendant was charged with the felony murder of Derrick King during the attempted murder of Jay King, and the trial court instructed the jury as to first degree felony murder and reckless endangerment. Finally, in Count 3 of the indictment, the Defendant was charged with the attempted first degree murder of Jay King, and the trial court instructed the jury on no lesser-included offenses.

The Defendant argues that in the premeditated murder charge, the trial court should have instructed the jury on the lesser-included offenses of voluntary manslaughter, reckless homicide and criminally negligent homicide. The Defendant also argues that in the felony murder charge, the trial court should have instructed the jury on the lesser-included offenses of facilitation, second degree murder, reckless homicide, and criminally negligent homicide. Finally, the Defendant argues that in the attempted first degree murder charge, the trial court should have instructed the jury on the lesser-included offense of attempted second degree murder. The State agrees that the trial court committed reversible error in failing to charge appropriate lesser-included offenses in Counts 1, 2, and 3.

Under the test adopted in State v. Burns, 6 S.W.3d 453 (Tenn. 1999), an offense is lesser-included if:
>    (a) all of its statutory elements are included within the statutory elements of the offense charged; or

(b) it fails to meet the definition in part (a) only in the respect that it contains a statutory element or elements establishing

(1) a different mental state indicating a lesser kind of culpability; and/or

(2) a less serious harm or risk of harm to the same person, property or public interest; or

(c) it consists of

(1) facilitation of the offense charged or of an offense that otherwise meets the definition of lesser-included offense in part (a) or (b); or

(2) an attempt to commit the offense charged or an offense that otherwise meets the definition of lesser-included offense in part (a) or (b); or

(3) solicitation to commit the offense charged or an offense that otherwise meets the definition of lesser-included offense in part (a) or (b).

Id. at 466-67.

Voluntary manslaughter is a lesser-included offense of first degree murder. State v. Dominy, 6 S.W.3d 472, 477 n.9 (Tenn. 1999). Criminally negligent homicide is a lesser-included offense of first degree murder. State v. Sims, 45 S.W.3d 1, 21 (Tenn. 2001). Also, reckless homicide is a lesser-included offense of first degree murder. State v. Ernest Edward Wilson, No. M2000-01997-CCA-R3-CD, 2002 Tenn. LEXIS 707, at *8 (Tenn., Nashville, Dec. 30, 2002).

Facilitation is a lesser-included offense of felony murder. State v. Richard Bruce Halfacre, No. 01C01-9703-CR-00083, 1998 Tenn. Crim App. LEXIS 1117, at *8 (Tenn. Crim. App., Nashville, Oct. 29, 1998). The offenses of second degree murder, reckless homicide, and criminally negligent homicide are lesser-included offenses of felony murder under part (b) of the Burns test. State v. Ely, 48 S.W.3d 710, 721-722 (Tenn. 2001); see generally Burns, 6 S.W.3d at 469.

"Attempted second degree murder is a lesser included offense of attempted first degree murder." State v. Jody Sweat, No. E2000-02472-CCA-R3-CD, 2001 Tenn. Crim. App. LEXIS 776, at *19 (Tenn. Crim. App., Knoxville, Sept. 26, 2001). Attempt to commit voluntary manslaughter and misdemeanor reckless endangerment are also lesser-included offenses of attempted first degree murder. State v. Kenneth Anthony Henderson, M1999-00547-CCA-R3-CD, 2002 Tenn. Crim. App. LEXIS 316, at *14 (Tenn. Crim. App., Nashville, Apr. 11, 2002).

The trial court "has the duty to give a complete charge of law applicable to the facts of the case." State v. Davenport, 973 S.W.2d 283, 287 (Tenn. Crim. App. 1998). However, the trial court is not required to instruct the jury on all lesser-included offenses. Rather, the Tennessee Supreme Court has adopted the following two-step process for determining if the evidence justifies a jury instruction on the lesser-included offense:

First, the trial court must determine whether any evidence exists that reasonable minds could accept as to the lesser-included offense. In making this determination, the trial court must view the evidence liberally in the light most favorable to the existence of the lesser-included offense without making any judgments on the credibility of such evidence. Second, the trial court must determine if the evidence,

viewed in this light, is legally sufficient to support a conviction for the lesser-included offense.

Burns, 6 S.W.3d at 469. "The guiding principle is that if there is evidence in the record from which the jury could conclude that a lesser included offense was committed, there must be an instruction for the lesser offense." State v. Ben Mills, W1999-01175-CCA-R3-CD, 2002 Tenn. Crim. App. LEXIS 405, at *23 (Tenn. Crim. App., Jackson, May 3, 2002).

We thus turn to consideration of whether "any evidence exists that reasonable minds could accept as to the lesser-included offense[s]." Burns, 6 S.W.3d at 469. Voluntary manslaughter is an "intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Tenn. Code. Ann. § 39-13-211(a). The proof in this case could support the "state of passion," id., and "adequate provocation," id., requirements of the statute. Evidence was presented at trial that the Defendant had been in an altercation with Jay King just prior to the drive-by shooting. A reasonable jury could have found that the Defendant was adequately provoked by the altercation and was acting in a "state of passion" when he went to the house on Clifton Avenue. As such, sufficient evidence was presented to support a conviction for voluntary manslaughter.

Reckless homicide is "a reckless killing of another." Id. § 39-13-215(a). "Under the definition of recklessness, the jury would have been required to find that the Defendant either (1) acted recklessly with regard to the circumstances surrounding his conduct, or (2) consciously disregarded a substantial and unjustifiable risk that death would occur." State v. Ricky A. Burks, No. M2000-00345-CCA-R3-CD, 2001 Tenn. Crim. App. LEXIS 388, at *78 (Tenn. Crim. App., Nashville, May 25, 2001). A person commits criminally negligent homicide when he or she causes a death by engaging in criminally negligent conduct. State v. Kenneth Anthony Henderson, M1999-00547-CCA-R3-CD, 2002 Tenn. Crim. App. LEXIS 316, at *19 (Tenn. Crim. App., Nashville, Apr. 11, 2002). Testimony was presented that the Defendant was in one of the two cars involved in the drive-by shooting on Clifton Avenue, that resulted in the death of Derrick King. There was also testimony that the Defendant was shooting a weapon at the Clifton Avenue residence. Although there was testimony that the Defendant was intentionally shooting at Jay King, a reasonable jury could have conceivably found that the Defendant was merely acting in a reckless or negligent manner. As such, the trial court erred by not charging the jury with the offenses of reckless homicide and criminally negligent homicide as lesser-included offenses of felony murder. Because both reckless homicide and criminally negligent homicide are lesser-included offenses of premeditated murder under part (a) of the Burns test, it was error for the trial court not to charge those lesser-included offenses. Id. at **19-20.

Facilitation of a felony occurs when an individual, "knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39-11-402(2), . . . knowingly furnishes substantial assistance in the commission of the felony." Tenn. Code Ann. § 39-11-403(a). The intent required for criminal responsibility under Tennessee Code Annotated section 39-11-402(2) is "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense." Felony murder is "[a] killing of another

committed in the perpetration of or attempt to perpetrate any first degree murder, act of terrorism, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse, aggravated child neglect, or aircraft piracy . . . ." Id. § 39-13-202(a)(2). We conclude that the trial court erred by not charging the jury with facilitation. At least one witness testified that the Defendant did not have a gun on the night of the offense. A reasonable jury could have concluded that the Defendant merely facilitated the offense.

Second degree murder is defined, in pertinent part, as a "knowing killing of another." Id. § 39-13-210(a)(1). A person acts "knowingly" when "the person is aware that the conduct is reasonably certain to cause the result . . . ." Id. § 39-11-106(a)(20). Once a homicide has been established, it is presumed to be second degree murder, and the State has the burden of proving premeditation to raise the offense to first degree murder. State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999) (citing State v. Nesbit, 978 S.W.2d 872, 898 (Tenn. 1998)). The trial court charged the jury with second degree murder as a lesser-included offense of premeditated murder, but it did not charge second degree murder as a lesser-included offense of felony murder. The jury ultimately convicted the Defendant of second degree murder as a lesser-included offense of premeditated murder. We conclude that second degree murder should have also been charged as a lesser offense of felony murder in this case. Evidence was presented at trial that the Defendant was at the scene of the offense and that he was firing a weapon. A reasonable jury could have found that the Defendant was aware that the conduct was reasonably certain to cause the result.

"A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense . . . [a]cts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." Tenn. Code Ann. § 39-12-101(a)(3). As previously stated, second degree murder is the knowing killing of another. Id. § 39-13-210(a)(1). Thus, the offense of attempted second degree murder requires proof of the following elements: (1) a knowing, (2) attempt, (3) to kill another. State v. Rush, 50 S.W.3d 424, 430 (Tenn. 2001).

Finally, although not raised as an issue by the Defendant, we conclude that the trial court also erred in failing to instruct the jury on attempted voluntary manslaughter as a lesser-included offense of attempted first degree murder. A reasonable jury could have found that the Defendant, acting in a state of passion and with adequate provocation, tried to kill Jay King. Evidence was presented that the Defendant had been in an altercation with King immediately prior to the offense in this case. Evidence was presented that the Defendant was upset about the altercation and that he sought out King. Thus, the trial court erred in failing to instruct the jury on attempted voluntary manslaughter.

Thus, regarding the charge of premeditated murder, we conclude that in this case, evidence does exist from which reasonable minds could accept as to the lesser-included offenses of voluntary manslaughter, reckless homicide and criminally negligent homicide. Regarding the charge of felony murder, we conclude that evidence does exist from which reasonable minds could accept as to the lesser-included offenses of facilitation, second degree murder, reckless homicide, and criminally

-12-

negligent homicide. Finally, regarding the attempted first degree murder charge, we conclude that evidence does exist from which reasonable minds could accept as to the lesser-included offenses of attempted second degree murder and attempted voluntary manslaughter. We also conclude that sufficient evidence existed to support the convictions for the above lesser-included offenses.

Having concluded that the trial court erred in failing to instruct the jury on various lesser-included offenses, we must decide if the errors were harmless beyond a reasonable doubt. Reversal of the Defendant's convictions is required unless we conclude "beyond a reasonable doubt that the error did not affect the outcome of the trial." State v. Allen, 69 S.W.3d 181, 189 (Tenn. 2002). In Allen, our supreme court stated:

> When a lesser-included offense instruction is improperly omitted, we conclude that the harmless error inquiry is the same as for other constitutional errors: whether it appears beyond a reasonable doubt that the error did not affect the outcome of the trial. In making this determination, a reviewing court should conduct a thorough examination of the record, including the evidence presented at trial, the defendant's theory of defense, and the verdict returned by the jury. A reviewing court may find the error harmless because the jury, by finding the defendant guilty of the highest offense to the exclusion of the immediately lesser offense, necessarily rejected all other lesser-included offenses. Harmless error is not limited, however, to such cases.

Id. at 191 (citations omitted).

Recently, our supreme court clarified the distinction between a determination as to whether or not a lesser-included offense ought to be charged and a determination as to whether or not the failure to charge a lesser-included offense is harmless beyond a reasonable doubt. In State v. Linnell Richmond, No. E2000-01545-SC-R11-CD, 2002 Tenn. LEXIS 473, at *37 (Tenn., Knoxville, Nov. 1, 2002), our supreme court stated the following:

> In sum, when a reviewing court determines whether a lesser-included offense ought to be charged, the evidence clearly controls. If there is evidence sufficient to support a conviction for a lesser-included offense, we hold that a trial court must charge that offense. The determinative test being whether there is evidence sufficient such that a jury could convict on that lesser-included offense. If a jury could convict, no matter how improbable, it is error not to charge that lesser-included offense. However, in deciding whether it was harmless beyond a reasonable doubt not to charge a lesser-included offense, the reviewing court must determine whether a reasonable jury would have convicted the defendant of the lesser-included offense instead of the charged offense. In other words, the reviewing court must determine whether it appears beyond a reasonable doubt that the trial court's failure to instruct on the lesser-included offense did not affect the outcome of the trial. Allen, 69 S.W.3d at 191.

Thus, our task is to determine whether it appears beyond a reasonable doubt that the trial court's failure to instruct on the lesser-included offenses did not affect the outcome of the trial. As set forth in Richmond, this task includes a determination by this Court as to whether a reasonable

jury would have convicted the Defendant of the lesser-included offense(s) instead of the charged offense(s).

If the Richmond and Allen harmless error analyses for lesser-included offenses are taken together and stated slightly differently, we believe that the appropriate determinative test can be stated as follows: If it appears beyond a reasonable doubt from our review of the evidence that a reasonable jury would not have convicted the Defendant of the lesser-included offense instead of the charged offense, then the trial court's error in failing to charge the lesser-included offense is harmless.

We must now apply that test to the evidence in this case. Evidence was presented that the Defendant had been in an altercation with Jay King immediately prior to the Defendant's killing of Derrick King. The prior altercation involved shots being fired at the Defendant by Jay King. Shortly thereafter, the Defendant and his companions drove to a house occupied by Jay King and the Defendant attempted to shoot Jay King. During the course of this act, Derrick King was shot and killed. Based upon the provocation resulting from the prior altercation between the Defendant and Jay King, we cannot conclude beyond a reasonable doubt that a reasonable jury would not have convicted the Defendant of the lesser-included offense of voluntary manslaughter instead of second degree murder. Our conclusion is the same with regard to reckless homicide and criminally negligent homicide. Furthermore, using the same analysis, we can not conclude beyond a reasonable doubt that a reasonable jury would not have convicted the Defendant of one of the aforementioned lesser-included offenses in Counts 2 and/or 3 of the indictment. Accordingly, we must reverse the Defendant's convictions in Counts 1, 2, and 3 and remand these counts to the trial court for a new trial. In the event of further review, we will address the additional issues raised in this appeal.

## B. Motion to Suppress

The Defendant argues that the trial court erred by failing to suppress the photographic lineup. In the motion for new trial, counsel stated that the lineup was "highly suggestive." Counsel claimed that an eyewitness had told police that the shooter had gold teeth, and counsel pointed out that the Defendant was the only one with his teeth showing in the photographs. When reviewing a trial court's ruling on a motion to suppress, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). Findings of fact made by a trial court in ruling on a motion to suppress are binding upon this court unless the evidence preponderates against the findings. See id. However, "[t]he application of the law to the facts found by the trial court . . . is a question of law which this court reviews de novo." State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997).

In this case, the Defendant failed to include in the record a transcript of the suppression hearing. It is the defendant's duty to prepare an adequate record for appellate review. Tenn. R. App. P. 24(b). In the absence of an adequate record, we must conclusively presume that the determinations made by the trial court were correct. State v. Oody, 823 S.W.2d 554, 559 (Tenn.

Crim. App. 1991). As such, we must presume that the trial court correctly determined that the photographic lineup was not unduly suggestive. In addition, the only person who was able to identify the Defendant in the lineup had already told police that the shooter was the Defendant. This issue is without merit.

C. Sufficiency of the Evidence

The Defendant argues that insufficient evidence was presented at trial to convict him of second degree murder, felony murder, attempted first degree murder and five counts of reckless endangerment. When an accused challenges the sufficiency of the evidence, an appellate court's standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 324 (1979); State v. Duncan, 698 S.W.2d 63, 67 (Tenn. 1985). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. State v. Buggs, 995 S.W.2d 102, 105 (Tenn. 1999); Liakas v. State, 286 S.W.2d 856, 859 (Tenn. 1956). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. Liakas, 286 S.W.2d at 859. This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. Id.

Sufficient evidence was presented to convict the Defendant of attempted first degree murder. "A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense . . . [a]cts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part." Tenn. Code Ann. § 39-12-101(a)(2). First degree premeditated murder is the premeditated and intentional killing of another person. Id. § 39-13-202(a)(1). As previously stated, once a homicide has been established, it is presumed to be second degree murder, and the State has the burden of proving premeditation to raise the offense to first degree murder. State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999) (citing State v. Nesbit, 978 S.W.2d 872, 898 (Tenn. 1998)). Premeditation is defined as "an act done after the exercise of reflection and judgment." Tenn. Code Ann. § 39-13-202(d).

> "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the

-15-

accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id. Premeditation is the process of thinking about a proposed killing before engaging in the homicidal conduct. State v. Brown, 836 S.W.2d 530, 540-41 (Tenn. 1992).

The existence of premeditation is a question of fact for the jury to determine and may be inferred from the circumstances surrounding the offense. State v. Rosa, 996 S.W.2d 833, 837 (Tenn. Crim. App. 1999) (citing Brown, 836 S.W.2d at 539). "[T]he use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime; and calmness immediately after the killing" may support the existence of premeditation. State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997). This Court has also noted that the jury may infer premeditation from planning activity by the defendant before the killing, evidence concerning the defendant's motive, and the nature of the killing. State v. Bordis, 905 S.W.2d 214, 222 (Tenn. Crim. App. 1995).

Philander Jones testified that the Defendant told him that he had been in an altercation with Jay King at an Amoco station. According to Jones, he, the Defendant, and several other men then began to look for Jay King. Jones testified that he witnessed gunshots coming from the car in which the Defendant was a passenger. Darrell McQuiddy testified that he was driving the car in which the Defendant was the passenger. McQuiddy testified that when the Defendant told him about the prior altercation with Jay King, McQuiddy stated that he planned to "take care of [King]." McQuiddy stated that when they saw the Defendant's car and a group of people standing in the yard where the car was parked, he pulled in front of the yard, and the Defendant "hung out the window and shot" at the people in the yard. Jay King identified the Defendant as one of the men shooting at the people in the yard, and King stated that the Defendant was trying to shoot at him. Once the gunfire had ceased, it was determined that Derrick King had been shot in the head. Officer Bernard testified that at the scene of the crime "some of the witnesses told [him] that the person that shot Derrick King" was the Defendant. There was sufficient evidence that the Defendant participated in the drive-by shooting in an attempt to kill Jay King.

From the above facts, we also conclude that sufficient evidence was presented to convict the Defendant of felony murder. As previously stated, felony murder is defined as "[a] killing of another committed in the perpetration of or attempt to perpetrate any first degree murder, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse, aggravated child neglect or aircraft piracy . . . ." Tenn. Code Ann. § 39-13-202(a)(2). We have already concluded that there was sufficient evidence that the Defendant attempted to murder Jay King in a drive-by shooting. However, it was actually King's cousin who was killed. As such, a reasonable jury could have found that the Defendant killed Derrick King during the attempted murder of Jay King.

Sufficient evidence was presented to convict the Defendant of second degree murder. As previously stated, second degree murder is defined by statute as a "knowing killing of another." Id.

§ 39-13-210(a)(1). "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Id. § 39-11-302(b). Evidence was presented that the Defendant knowingly shot into a large group of people. As such, a reasonable jury could have found that the Defendant knew that his conduct was "reasonably certain," id., to cause a death. This issue is without merit.

The Defendant contends that no evidence was presented that he was attempting to shoot or to kill Derrick King. The Defendant states that "there was no proof that the [D]efendant knew the victim or knew he would be present when the shooting occurred." However, "if the evidence demonstrates that the defendant intended to 'cause the result,' the death of a person, and that he did so with premeditation and deliberation, then the killing of another, even if not the intended victim (i.e., intended result), is first degree murder." Millen v. State, 988 S.W.2d 164, 168 (Tenn. 1999). In this case, evidence was presented that the Defendant had been in altercation with Jay King at a gas station and that he later went to find Jay King to kill him, but instead it was Jay King's cousin, Derrick King, that was killed as a result of the gunfire. Thus, it does not matter whether the Defendant knew the victim, because the victim was killed as a result of the Defendant's attempted murder of Jay King.

The Defendant also appears to argue that he was not necessarily the one who actually shot Derrick King, stating that "others were shooting from a car when the incident occurred." This issue is without merit because the jury was charged on criminal responsibility. "A person is criminally responsible for an offense committed by the conduct of another if . . . [a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense . . . ." Tenn. Code Ann. § 39-11-402(2). In this case, evidence was presented that the Defendant was shooting at the people in the yard of the residence where Jay King's vehicle was parked. Evidence was also presented that shots were fired from another car that was at the scene. Based on the doctrine of criminal responsibility, it does not matter whether the bullet that actually killed the victim came from the Defendant's gun or from the gun of another person who was acting in conjunction with the Defendant. Thus, sufficient evidence was presented to convict the Defendant of second degree murder, felony murder and attempted first degree murder.

Finally, sufficient evidence was presented to convict the Defendant of five counts of reckless endangerment. Evidence was presented that Ernest Christian, Corey King, Ernest King, Ronald Scruggs and Alonzo Stevenson were all present at the house on Clifton Avenue during the drive-by shooting. As such, all were in danger of being shot. This issue is without merit.

D. Ineffective Assistance of Counsel

The Defendant argues that trial counsel was ineffective. Specifically, the Defendant argues that counsel should have asked the trial court to strike testimony by Darrell McQuiddy that McQuiddy had paid counsel to represent the Defendant. The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and

Article I, Section 9 of the Tennessee Constitution. Id.; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). This right to representation includes the right to "reasonably effective" assistance. Burns, 6 S.W.3d at 461. In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. Baxter, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness," Strickland v. Washington, 466 U.S. 668, 688 (1984), and that this performance prejudiced the defense, resulting in a failure to produce a reliable result. Id. at 687; Cooper v. State, 849 S.W.2d 744, 747 (Tenn.1993). To satisfy the requirement of prejudice, a petitioner must show a reasonable probability that, but for counsel's unreasonable error, the fact finder would have had reasonable doubt regarding the petitioner's guilt. Strickland, 466 U.S. at 695. This reasonable probability must be "sufficient to undermine confidence in the outcome." Id. at 694; see also Harris v. State, 875 S.W.2d 662, 665 (Tenn. 1994).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. Strickland, 466 U.S. at 690; State v. Mitchell, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court must evaluate the questionable conduct from the attorney's perspective at the time. Strickland, 466 U.S. at 690; Cooper, 849 S.W.2d at 746; Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Burns, 6 S.W.3d at 462. Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. Williams v. State, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980).

At the motion for new trial, counsel stated that he had been ineffective in representing the Defendant. Counsel stated that Darrell McQuiddy, one of the main witnesses for the State, retained counsel to represent the Defendant. Counsel stated that at trial, Darrell McQuiddy "blurted out" that he had paid counsel to represent the Defendant. Counsel contends that he was ineffective because he failed to ask the trial judge to strike that testimony. Counsel also contends that prior to trial, he failed to ask the trial court to instruct Darrell McQuiddy not to talk about the fact that he brought money to counsel to represent the Defendant. As such, counsel argues that he "lost credibility with the jury."

We fail to see how the payment of the Defendant's attorney's fees by Darrell McQuiddy renders trial counsel ineffective. There is nothing in the record to indicate that counsel was acting on behalf of Darrell McQuiddy or that he had any professional relationship with him. Moreover, even if trial counsel was ineffective, we fail to see how any deficiencies in his representation affected the outcome of the trial. No evidence was presented that counsel's representation of the Defendant affected the jury's determinations. This issue is without merit.

## E. Sentencing

The Defendant argues that the trial court improperly sentenced him by ordering him to serve his sentences consecutively and by failing to properly address his sentence as it relates to a prior federal sentence. When a criminal defendant challenges the length, range, or manner of service of a sentence, the reviewing court must conduct a de novo review of the sentence with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d). This presumption, however, "is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In the event that the record fails to show such consideration, the review of the sentence is purely de novo. State v. Shelton, 854 S.W.2d 116, 123 (Tenn. Crim. App. 1992).

In making its sentencing determination, the trial court, at the conclusion of the sentencing hearing, determines the range of sentence and then determines the specific sentence and the propriety of sentencing alternatives by considering (1) the evidence, if any, received at the trial and the sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct involved, (5) evidence and information offered by the parties on the enhancement and mitigating factors, (6) any statements the defendant wishes to make in the defendant's behalf about sentencing, and (7) the potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-210(a), (b), -103(5); State v. Williams, 920 S.W.2d 247, 258 (Tenn. Crim. App. 1995).

The presumptive sentence to be imposed by the trial court for a Class B, C, D or E felony is the minimum within the applicable range unless there are enhancement or mitigating factors present. Tenn. Code Ann. § 40-35-210(c). The presumptive sentence for a Class A felony is the midpoint of the sentencing range unless there are enhancement or mitigating factors present. Id. § 40-35-210(c). If there are enhancement or mitigating factors, the court must start at the presumptive sentence, enhance the sentence as appropriate for the enhancement factors, and then reduce the sentence in the range as appropriate for the mitigating factors. Id. § 40-35-210(e). The weight to be given each factor is left to the discretion of the trial judge. Shelton, 854 S.W.2d at 123. However, the sentence must be adequately supported by the record and comply with the purposes and principles of the 1989 Sentencing Reform Act. State v. Moss, 727 S.W.2d 229, 237 (Tenn. 1986).

When imposing a sentence, the trial court must make specific findings of fact on the record supporting the sentence. Tenn. Code Ann. § 40-35-209(c). The record should also include any enhancement or mitigating factors applied by the trial court. Id. § 40-35-210(f). Thus, if the trial court wishes to enhance a sentence, the court must state its reasons on the record. The purpose of recording the court's reasoning is to guarantee the preparation of a proper record for appellate review. State v. Ervin, 939 S.W.2d 581, 584 (Tenn. Crim. App. 1996). Because the record in this case indicates that the trial court adequately considered the enhancement and mitigating factors as well as the underlying facts, our review is de novo with a presumption of correctness.

If our review reflects that the trial court followed the statutory sentencing procedure, that the court imposed a lawful sentence after having given due consideration and proper weight to the factors and principles set out under the sentencing law, and that the trial court's findings of fact are adequately supported by the record, then we may not modify the sentence "even if we would have preferred a different result." State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991). The defendant bears the burden of showing the impropriety of the sentence imposed. Ashby, 823 S.W.2d at 169.

## 1. Consecutive Sentencing

The Defendant argues that the trial court erred by ordering that his thirty-five year sentence for attempted first degree murder run consecutive to his life sentence for felony murder. It is within the sound discretion of the trial court whether or not an offender should be sentenced consecutively or concurrently. State v. James, 688 S.W.2d 463, 465 (Tenn. Crim. App. 1984). A court may order multiple sentences to run consecutively if it finds by a preponderance of the evidence that the Defendant fits in one of the categories established in the statute. Tenn. Code Ann. § 40-35-115(b). An extensive history of criminal activity is enough to support consecutive sentencing. State v. Adams, 973 S.W.2d 224, 231 (Tenn. Crim. App. 1997).

The trial court found that the Defendant "is a professional criminal who has knowingly devoted such defendant's life to criminal acts as a major source of livelihood." Tenn. Code Ann. § 40-35-115(b)(1);

The trial court also found that the Defendant "is an offender whose record of criminal activity is extensive," Id. § 40-35-115(b)(2).

Finally, the trial court found that the Defendant "is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." Id. § 40-35-115(b)(4). When imposing consecutive sentences for an offender found by the court to be dangerous, the court must also determine that consecutive sentences are reasonably related to the severity of the offenses committed and that consecutive sentences are necessary to protect the public from further criminal conduct by the defendant. State v. Wilkerson, 905 S.W.2d 933, 939 (Tenn. 1995); State v. Lane, 3 S.W.3d 456, 461 (Tenn. 1999). The Defendant has a history of criminal activity which includes two prior felony drug convictions. The Defendant was also convicted in federal court in 1996 for possession of handguns and aiding and abetting. There was adequate evidence for the trial court to conclude that consecutive sentences were necessary to protect the public from further criminal activity by the Defendant. Moreover, the circumstances surrounding the crime were such that the trial court was justified in finding that the consecutive sentences were reasonably related to the severity of the offenses committed.

### 2. Federal Sentence

The Defendant also argues that the trial court failed to properly address his sentence in this case as it relates to a prior federal sentence. When a defendant has "additional sentences or portions thereof to serve, as the result of conviction . . . in federal court, the sentence imposed shall be consecutive thereto unless the court shall determine in the exercise of its discretion that good cause exists to run the sentences concurrently and explicitly so orders." Tenn. R. Crim. P. 32(c)(2). It appears from the record that the trial court mistakenly assumed that it had no discretion in determining whether the state sentence should be served concurrently or consecutively with the federal sentence. The trial court stated, "I think the Federal sentence is . . . that's by operation of law." As such, the Defendant's sentences were ordered to be served consecutively to the prior federal sentence. We conclude that Count 4 of this case must be remanded to the trial court to determine, pursuant to Tennessee Rules of Criminal Procedure 32(c)(2), whether the Defendant's state sentence should be served consecutively to or concurrently with his prior federal sentence.

### F. Conclusion

Concluding that the trial court erred by failing to instruct the jury on all lesser-included offenses in Counts 1, 2, and 3, and by failing to address whether the Defendant's sentence in Count 4 would be served consecutively to his prior federal sentence, we REVERSE Counts 1, 2, and 3, and REMAND those counts to the trial court for a new trial. In Count 1, we note that on remand the Defendant can be tried only for second degree murder and lesser-included offenses of second degree murder. Double jeopardy considerations would prohibit another trial for pre-meditated first degree murder as originally charged in Count 1. We remand Count 4 to the trial court for a determination pursuant to Tennessee Rules of Criminal Procedure 32(c)(2) as to whether the sentence in Count 4 should be served concurrently with or consecutively to the Defendant's prior federal sentence.

_____
ROBERT W. WEDEMEYER, JUDGE